IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                       NO.  4:07CR00271 GTE

MYRON SAWYER

## ORDER AND SUPPLEMENTAL FINDINGS

The Defendant has filed a "Motion to Suppress Statement" and a "Motion to Suppress Physical Evidence." On Wednesday, September 3, 2008, the Court held a hearing on both motions. At the conclusion of the evidence and following oral argument by counsel, the Court announced its decision to deny both motions. This Order supplements and further explains the Court's decision.

## Motion to Suppress Physical Evidence

The Court will first take up the Defendant's Motion to Suppress Physical Evidence, wherein Defendant asserts that on June 22, 2007, members of the Little Rock Police Department illegally detained him and conducted an illegal search and seizure of his person and property. Defendant alleges that "such search was made without freely given voluntary consent and with the absence of such extrinsic circumstances as to give probable cause or justify a search and seizure." The Defendant moves to suppress the evidence he contends was thus illegally obtained.

On June 22, 2007, shortly after noon, the Bank of Little Rock, located at 5120 Kavanaugh Boulevard, Little Rock, Arkansas, was robbed by a single, armed and masked person. The robbery was recorded by a video camera in its entirety. The robber first demanded that everyone get on the floor as he brandished the handgun and then demanded money. He wore a face mask

and green jumpsuit and his voice appeared to be that of a black male. He vaulted on and over the bank counter to access the money. The surveillance video confirmed that he stepped on the counter during the robbery. A later audit determined the loss to be $10,823.00.

A citizen, Mr. Lane Guthrie, was driving east on Kavanaugh Blvd. when he observed a black male sprinting South across Kavanaugh and down an alley in the vicinity of the bank. Mr. Guthrie attempted to follow this person. He then observed a gold Saturn automobile turn westbound on Cantrell Road slightly behind him. Mr. Guthrie had turned right on Cantrell just as the gold Saturn entered heavily traveled Cantrell without slowing down. Mr. Guthrie allowed the gold Saturn, which was swerving, to pass him and observed that it had Arkansas license #668-JHW. Mr. Guthrie observed two black males in the front seat. He followed the vehicle to University Avenue where it turned South. Mr. Guthrie continued to follow the vehicle down University to the Park Plaza area near the intersection of University and West Markham Street. On the way, he observed a third black male sit up in the back seat. Mr. Guthrie then returned to Kavanaugh where he had first observed the suspicious man running across the street. He observed police officers at the bank and provided them with this information.

The masked robber had demanded that the bank tellers put the money in a bag that he brought along. Hidden in the money given to the robber was an electronic tracking device ("ETD") which was activated. Using GPS technology, the ETD allowed the police to track the movement of the get-away vehicle as it traveled east on Interstate 630, then Southbound on Cedar and finally, westbound on Asher Avenue. This information was broadcast on the police radio.

At approximately 12:05 p.m., Detective Tommy Hudson was filling his patrol car with

gas at the corner of Fair Park Blvd. and W. Markham Street near War Memorial Stadium when he heard about the robbery over the radio.  He learned that the suspect was a black male in a green jumpsuit.  He also learned that the signal from the ETD indicated that the suspect was in a vehicle heading East on I-630 and then South on Cedar Street.  Detective Hudson drove South on Cedar to a location near Asher Ave. and Madison St. where he observed a gold Saturn traveling at an unusually high rate of speed across the parking lot of Bennett's Tire Service ("Bennett's") .  By this time the area was saturated with marked police vehicles.  Detective Hudson was traveling so fast that he passed the gold Saturn before he could stop.  He quickly turned his unmarked vehicle around and activated the blue lights.

The gold Saturn exited Bennett's parking lot and quickly parked at an adjacent mini-market.  Detective Hudson pulled in behind the Saturn, partially blocking it.  Detective Hudson testified that he learned around this time that the robbery suspect was believed to be in a gold Saturn.  The male driver, later determined to be the Defendant Myron Sawyer, exited the Saturn and quickly moved away, but was promptly ordered to the ground at gunpoint.

Another officer, Kenny Baer, had arrived by this time in a marked police unit.  As he arrived, Officer Kenny Baer found that Detective Hudson was in the process of ordering a suspect to the ground.  He pulled his gun and covered while the Defendant was hand-cuffed.  The Defendant was then walked to Officer Baer's marked police car to be frisked.  As Detective Hudson walked with Defendant past the Saturn, he observed through the open window a gun on the floor of the front seat passenger side.  Officer Baer conducted a pat down of the Defendant and then locked him in his unit. Officer Baer noted that the Defendant was secured at 12:28 p.m.

Officer Hudson then returned to the Saturn to secure the gun, later identified as a Ruger 9

mm pistol that was fully loaded with one cartridge in the chamber. In clear view in the back seat Detective Hudson also observed a green jumpsuit and a bag with money falling out of it.[1] Detective Hudson secured the evidence and disabled the tracking device.

Another officer found additional evidence in and around a dumpster located behind Bennett's. The evidence included a Louis Vuitton purse (reported stolen by a bank customer during the robbery), a wig, sunglasses, and a knit ski mask.[2]

Officer Baer was the officer who completed the form necessary to have the gold Saturn towed. The tow vehicle report (Government's L) shows this occurred at 12:35 p.m.[3] Officer Baer then transported the Defendant to the Little Rock downtown detective station.

Officer Jennifer Zarlingo, a crime scene specialist with the Little Rock Police Department, responded to the Bank at around 12:52 p.m. She retrieved the video. She also located and "lifted" a shoe print which was on the counter top. The imprint clearly showed the following identification: "US Polo Assn."

The Court concludes that the police had probable cause to initially stop the Defendant, who was suspected of being involved in the recent robbery of the Bank of Little Rock. The Fourth Amendment is not violated when a police officer with reasonable suspicion that criminal activity is afoot briefly detains a suspect while making a reasonable investigation to confirm or dispel the officer's suspicions. *Terry v. Ohio*, 392 U.S. 1, 20 (1958). Within seconds of securing

---

[1] See Government's Exhibits B-1 (the gun); C-1 (the green jumpsuit), E-1 (U.S. currency) and F-1 (the electronic tracking device).

[2] See Government's Exhibits G (wig); H (knit cap); I (photograph of purse) and J (photograph of sunglasses).

[3] See Government's Exhibit L.

Defendant, Detective Hudson saw the gun in the car and moments thereafter the jumpsuit and money.  At that point, probable cause existed to arrest the Defendant for bank robbery.  *See United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006)(probable cause for arrest exists when, at the time of the arrest, "'the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested.'")(omitting citation to quoted case).

Defendant's Motion to Suppress Physical Evidence is denied.

## Motion to Suppress Statement

Defendant contends that he was not properly advised of his constitutional rights in accordance with *Miranda vs. Arizona*[4] and that any statement taken from him would therefore, be inadmissible.  He contends that he did not knowingly, intelligently or voluntarily waive his constitutional rights against self-incrimination.

The Defendant was not questioned at the scene.  There is no evidence that he made any statements at the scene.  Following his arrest and while sitting in an interrogation room at the police department, the Defendant made a statement confessing to the robbery.  Defendant's statement was made at approximately 3:02 p.m. on the same day in which the Bank of Little Rock was robbed.  That statement was tape-recorded and a transcript thereof has been made.[5]

Although other evidence relates to the issue, the two prosecution witnesses relied upon principally by the Government were Little Rock Police Officers Bobby Martin and Eric Hinsley.

After the Defendant Myron Sawyer was arrested he was taken to a Little Rock Police

---

[4] 384 U.S. 436 (1966).

[5] See Government's Exhibits P-1 (recorded statement) and P-2 (transcript of statement).

Department detective station where he was placed in an interview room. Officer Bobby Martin testified that he advised the Defendant of his *Miranda* rights at approximately 1:35 p.m. by reading same to him.[6] The Defendant gave his date of birth, his address and acknowledged that he could read and write . He declined, however, to sign the form waiving his rights and agreeing to answer questions regarding the bank robbery. Officer Bobby Martin testified that the Defendant advised he had "nothing to say." Officer Martin then left the interrogation room and proceeded to investigate another matter.

Detective Eric Hinsley first responded to the bank robbery by going to the bank and interviewing witnesses there. While he was at the bank, learned of the shoe print found on the bank counter which clearly displayed the clear logo "US Polo Assn." When Detective Hinsley arrived back at the police station, he went to the interview room to check on the Defendant's shoes. He asked to see the Defendant's shoes and Defendant obliged. As he examined the Defendant's shoes, Detective Hinsley noted audibly in the Defendant's presence that they "matched" the print taken from the counter of the bank.[7] Detective Hinsley may have also mentioned in the Defendant's presence other evidence known to the police including the car, gun, money, clothes, etc. At this point, the Defendant began asking questions about the case, indicating to Detective Hinsley that he wanted to talk about the case.

Thereupon Detective Hinsley left the interrogation room, obtained a *Miranda* form, returned and carefully read Defendant his *Miranda* rights while having the Defendant read same

---

[6] See Government's Exhibit M.

[7] See Government's Exhibit "N" (tennis shoes).

along with him.[8]  After the Defendant had been properly *mirandized* Detective Hinsley took a taped statement from the Defendant.  Detective Hinsley did not know that Officer Martin had previously *mirandized* him at 1:35 p.m..  The Defendant spent most of the time between 1:35 p.m. and 3:00 p.m. (the time he was *marandized* by Detective Hinsley) alone in the interrogation room.  He was not threatened or cajoled by anyone.  He was not interrogated or asked to make a statement.

The Defendant chose to testify at the suppression hearing but the Court finds little to credit in his testimony.  The Court specifically finds that the Defendant never asked Officer Martin or Detective Hinsley, or anyone else, to obtain an attorney for him, never requested the opportunity to make a phone call, and never stated that he wanted to talk to his mother.  The Defendant's testimony is controverted by his own taped statement, in which he acknowledges that he was properly advised of his rights and was agreeing to provide police with a statement regarding the bank robbery.  The evidence establishes that the Defendant voluntarily indicated to Officer Hinsley that he wanted to talk after being made aware of the overwhelming case that the Government had against him.   No promises were made to him to elicit his statement, although he surmised that he might benefit if he cooperated.

Defendant contends that his rights were violated because the police failed to "scrupulously honor" his initial invocation of his right to remain silent.  For this argument, Defendant relies upon *Michigan v. Mosley*, 423 U.S. 96 (1975).  The Court's review of the *Mosley* decision only reaffirms the Court's initial conclusion regarding the lawfulness of Defendant's confession.

---

[8] See Government's Exhibit "O" (executed Miranda form).

In *Mosley*, the Supreme Court found the defendant's confession was lawfully obtained. The Court reasoned as follows:

> This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistence and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.

*Id.*, at 105-06.

The only material difference in this case and *Mosley* is that in this case both the first interrogation and the second interrogation related to the same crime. In *Mosley*, the defendant invoked his right to remain silent to police inquiries about robberies, but more than two hours later agreed to answer questions about a homicide. However, as the Eighth Circuit has noted, "a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview." *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991); see also, *Jackson v. Wyrick*, 730 F.2d 1177, 1180 (8th Cir.), *cert. denied*, 469 U.S. 849 (1984)(unless police wear down defendant by repeatedly questioning on same subject after invocation of rights, no violation of Miranda to reinterrogate); *United States v. Finch*, 557 F.2d 1234 (8th Cir.),(as long as new Miranda warnings are given and initial request to remain silent is scrupulously honored, statements from subsequent interrogations on same subject are admissible), *cert. denied*, 434 U.S. 927 (1977).

The police scrupulously honored Defendant's initial invocation of his right to remain silent. At 1:35 p.m., when the Defendant indicated he did not want to talk, Officer Martin immediately left the room and did not thereafter attempt to question the Defendant. At 3:00

p.m., Defendant himself indicated a desire to talk when he began asking questions of Detective Hinsley.  Detective Hinsley advised Defendant of his Miranda rights, which the Defendant agreed to waive immediately prior to making a statement confessing to the bank robbery.

Defendant's statement was given freely and voluntarily.  The statement is admissible. Defendant's Motion to Suppress is denied.

## CONCLUSION

IT IS HEREBY ORDERED THAT Defendant Myron Sawyer's Motion to Suppress Physical Evidence (Doc. # 29) and Motion to Suppress Statement (Doc. # 31) be, and they are hereby, DENIED.

IT IS SO ORDERED THIS   5th   day of September, 2008.

 /s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE